No. 13-35688

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Montana Environmental Information Center, Earthworks' Oil and Gas
Accountability Project and WildEarth Guardians,
Plaintiffs-Appellants,

vs.

U.S. Bureau of Land Management, Sally Jewell, Jamie Connell, Theresa Hanley,
Defendants-Appellees,

and

American Petroleum Institute, Montana Petroleum Association, Montana Chamber
of Commerce, Western Energy Alliance,
Intervenor-Defendants-Appellees,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MONTANA, CASE No. 4:11-00015-SEH

## APPELLANTS' OPENING BRIEF

Shiloh S. Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
406.204.4861
hernandez@westernlaw.org

Erik Schlenker-Goodrich
Western Environmental Law Center
208 Paseo del Pueblo Sur, Unit 602

Sarah McMillan
WildEarth Guardians
P.O. Box 7516
Missoula, Montana 59807
406.549.3895
smcmillan@wildearthguardians.org

Taos, New Mexico 87571
575.613.4197
eriksg@westernlaw.org

*Counsel for Plaintiffs*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants, the Montana Environmental Information Center, Earthworks' Oil and Gas Accountability Project, and WildEarth Guardians (collectively, "MEIC") hereby certify to this Court that they are nonprofit organizations and that there are no parent corporations of or any publically held corporations that own any stock in any of the above-named entities.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................... vi

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF ISSUE.........................................................................1

STATEMENT OF CASE ........................................................................1

STATEMENT OF FACTS .......................................................................2

SUMMARY OF ARGUMENT ...............................................................13

ARGUMENT ....................................................................................14

I.      Standard of Review.................................................................14

II.     Article III Standing ...............................................................14

III.    The Declarations of MEIC's Members Wade Sikorski, Steve Gilbert,
        and George Wuerthner Meet the Requirements of Article III Standing
        Based Solely on the Surface Impacts of Oil and Gas Development. ...........18

IV.     The District Court's Holding That MEIC Lacked Standing Was in
        Error Because MEIC Has Standing Based on the Surface Impacts of
        Oil and Gas Development................................................................21

        A.      Because MEIC's Members Will Be Injured by the Surface
                Impacts of BLM's Oil and Gas Leases, MEIC May Challenge
                the Leases Based on Any Grounds on Which BLM Failed to
                Comply with NEPA, Including Grounds Related to the Leases'
                GHG Emissions. .................................................................23

                1.      MEIC's Injuries Caused by Surface Impacts of Lease
                        Development Establish Standing for MEIC to Pursue All
                        of Its NEPA Arguments. ..........................................23

2.      Holding That MEIC Has Standing to Pursue All of Its
NEPA Arguments Is Consistent with the Purposes
Behind the Standing Doctrine. ................................................31

B.      Alternatively, MEIC Has Standing to Assert Its Cumulative
Impacts Argument, Which Is Premised on the Surface Impacts
of Oil and Gas Development—Not GHG Emissions from Such
Development. ...................................................................................33

CONCLUSION .................................................................................................36

REQUEST FOR ORAL ARGUMENT ...............................................................38

STATEMENT OF RELATED CASES ................................................................38

CERTIFICATE OF COMPLIANCE....................................................................38

CERTIFICATE OF SERVICE ............................................................................39

# TABLE OF AUTHORITIES

## Cases

*Baker v. Carr*,
369 U.S. 186 (1962) ................................................................. 15, 31

*Barnes v. U.S. Dep't of Transp.*,
655 F.3d 1124 (9th Cir. 2011) ...............................................32

*Bd. of Natural Res. of St. of Wash. v. Brown*,
992 F.2d 937 (9th Cir. 1993) .................................................24

*Bennett v. Spear*,
520 U.S. 154 (2000) ...............................................................15

*Border Power Plant Working Group v. Dep't of Energy*,
260 F. Supp. 2d 997 (S.D. Cal. 2003) ..................................28

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003) ........................................ 17, 26

*City of Davis v. Coleman*,
521 F.2d 661 (9th Cir. 1975) ....................................... 17, 33

*City of Los Angeles v. Nat'l Highway Traffic Safety Admin.*,
912 F.2d 478 (D.C. Cir. 1990) ............................... 26, 27, 31

*Clapper v. Amnesty Int'l USA*,
133 S. Ct. 1147 (2013) ................................................. 16, 32

*Coleman v. Miller*,
307 U.S. 433 (1939) ...............................................................15

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ....................................... 3, 31

*Covington v. Jefferson County*,
358 F.3d 626 (9th Cir. 2004) ....................................29, 30, 31

*Ctr. for Biological Diversity v. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ..............................................25

*Ctr. for Biological Diversity v. Kempthorne,*
    588 F.3d 701 (9th Cir. 2009) ......................................................... 34, 35

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) ..................................................... 32, 34

*Ctr. for Food Safety v. Vilsack,*
    636 F.3d 1166 (9th Cir. 2011) .......................................... 17, 19, 20, 21

*DiamlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ....................................................... 16, 24, 28, 32

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,*
    438 U.S. 59 (1978) ...................................................................... 24, 28

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ...................................................................... 15, 31

*Fla. Audubon Soc'y v. Bentsen,*
    94 F.3d 658 (D.C. Cir. 1996) ...............................................................26

*Friends of the Earth v. Laidlaw,*
    528 U.S. 167 (2000) .................................................................... 15, 33

*Frothingham v. Mellon,*
    262 U.S. 447 (1923) ...............................................................................16

*Hall v. Norton,*
    266 F.3d 969 (9th Cir. 2001) ...............................................................15

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ....................................................... 16, 17, 25, 28

*Mass. v. EPA,*
    549 U.S. 497 (2007) ....................................................... 14, 16, 18, 20

*Nw. Envtl. Def. Ctr. v. Owens Corning Corp.,*
    434 F. Supp. 2d 957 (D. Or. 2006)......................................................29

*Sierra Club v. Adams,*
    578 F.2d 389 (D.C. Cir. 1978) .................................................... 18, 24

*Sierra Club v. Morton*,
   405 U.S. 727 (1972) ............................................................... 14, 24, 28

*Summers v. Earth Island Instit.*,
   555 U.S. 488 (2009) .....................................................................21

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) .......................................................14

*United States v. Students Challenging Regulatory Agency Procedures*
   (*SCRAP*),
   412 U.S. 669 (1973) ....................................................................18

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ..................................................... 19, 20

*Warth v. Seldin*,
   422 U.S. 490 (1975) ....................................................................24

*Washington Environmental Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) .......................................................31

*WildEarth Guardians v. U.S. Forest Serv.*,
   828 F. Supp. 2d 1223 (D. Colo. 2011) ............................................28

**Federal Statutes**

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

43 U.S.C. § 1701(a)(2) ...................................................................2

43 U.S.C. § 1712(a) .......................................................................2

**Federal Regulations**

43 C.F.R. § 3101.1-2.......................................................................3

43 C.F.R. § 3162.3-1(c) ...................................................................3

**Constitutional provision**

U.S. Const. art. III, § 2 ............................................................................14

**Miscellaneous**

William A. Fletcher, *The Structure of Standing*,
   98 Yale L.J. 221 (1988) ................................................................. 18, 33

## JURISDICTIONAL STATEMENT

The district court had jurisdiction of the action below pursuant to 28 U.S.C. § 1331, which establishes federal question jurisdiction, as this case involves judicial review of final federal agency action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which authorizes appellate jurisdiction of final orders and judgments of district courts.  The district court's final order and judgment dated June 14, 2013, disposed of all claims before that court.  MEIC filed its notice of appeal on August 1, 2013, within the 60-day period provided under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF ISSUE

Whether MEIC has constitutional standing to challenge the U.S. Bureau of Land Management's (BLM) analysis under the National Environmental Policy Act (NEPA) of the surface and climate-change-related impacts of oil and gas leasing decisions, where uncontested declarations demonstrate that MEIC's members have recreational and aesthetic interests in the specific areas proposed for lease development.

## STATEMENT OF CASE

MEIC has challenged BLM's NEPA analysis of the agency's decision to issue 100 leases for oil and gas development across 50,000 acres in the State of

Montana.  The American Petroleum Institute, Montana Petroleum Association,

Montana Chamber of Commerce, and Western Energy Alliance (collectively,

"Petroleum Institute") intervened in the action as defendants.  BLM produced an

administrative record in support of its NEPA analysis.  MEIC, BLM, and the

Petroleum Institute filed cross-motions for summary judgment based on the

administrative record.  MEIC also submitted standing declarations prepared by its

members.  The district court held oral argument.  Following oral argument, the

district court granted BLM's and the Petroleum Institute's motions for summary

judgment, concluding that MEIC lacked standing to challenge BLM's NEPA

analysis of the leasing decisions.  MEIC timely appealed.

## STATEMENT OF FACTS

BLM manages oil and gas resources on public lands through a three-stage

decision-making process.  At the first stage, the agency develops broad land use

plans to project an area's present and future uses, including making certain lands

available for oil and gas development.  43 U.S.C. §§ 1701(a)(2), 1712(a).  At the

second stage, BLM offers for sale and executes oil and gas leases subject to

various terms and conditions, often referred to as stipulations.  Under controlling

Ninth Circuit precedent and in accord with BLM rules, which provide that leases

confer surface-use rights, the execution of an oil and gas lease that is not subject to

a stipulation prohibiting all surface disturbances is an irretrievable commitment of

resources requiring full analysis under NEPA.  43 C.F.R. § 3101.1-2; *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988).  At the third stage, BLM approves applications for permits to drill (APD), allowing for lease development.  43 C.F.R. § 3162.3-1(c).  During this third stage, unlike the second stage, BLM has only limited authority to impose additional terms and conditions on oil and gas operators.  *Id.* § 3101.1-2.  The instant case focuses on BLM's actions at the second stage: the execution of oil and gas leases on over 50,000 acres of public land within Montana.

In 2010, in conjunction with a series of proposed oil and gas lease sales across its various field offices throughout Montana, BLM prepared a series of virtually identical draft environmental assessments (EAs) in an attempt to comply with NEPA.  ER000030.[1]  In written comments on the EAs, MEIC questioned BLM's failure to consider alternatives that would impose lease stipulations or other mandatory measures requiring lessees to employ available, cost-effective technologies to capture (and eventually sell[2]) large quantities of methane, a potent greenhouse gas (GHG), that would otherwise be leaked, vented, or flared into the atmosphere.  ER000205-08; ER000225-26; ER000239-41.  Relying on information

---

[1]  For ease of reference and consistent with the parties' practice at both the administrative and district court levels, MEIC will refer to the EA prepared for the Miles City Field Office, as a representative EA.  ER000048.

[2]  Methane is the primary constituent of natural gas, a marketable energy mineral resource.

from the U.S. Environmental Protection Agency (EPA) and BLM, MEIC estimated that if BLM captured methane that would otherwise be lost to the atmosphere from oil and gas development in just Montana and the Dakotas, it could annually generate upwards of $9 million in additional natural gas sales and eliminate GHG pollution equivalent to that emitted by 134,211 passenger cars. ER000240-41. On a nation-wide level, if instead of venting or flaring just 40% of the methane from on-shore oil and gas operations, industry captured that methane, it would have the same effect as removing 3.1 million cars from the roads and would generate $23 million in federal royalties at the same time. ER000273-74.

MEIC's comments further challenged BLM's failure to consider the cumulative impacts to natural resources from surface development of the 100 proposed leases—which covered over 50,000 acres—in conjunction with projected impacts from climate change. ER000213-14; ER000236; ER000304 at ¶¶ 5-6.

EPA also commented on the draft EAs, raising the same concerns about alternatives and cumulative impacts that MEIC raised. ER000343-46. "The EAs," EPA wrote, "should include a discussion of reasonable alternatives available at the leasing stage that could result in lower GHG emissions." ER000345. EPA recommended that "lease stipulations be added to require implementation of GHG mitigation measures." ER000343.

> Although the leases individually many not contribute substantial GHG emissions, several Field Offices project substantial GHG emissions

> from oil and gas development. Given that BLM has proposed
> Findings of No Significant Impact, incorporating reasonable
> mitigation measures to reduce these GHG emissions, along with other
> environmental impacts, at this leasing stage would appear to be an
> important consideration for its final decision[,]

EPA wrote. ER000344. EPA further recommended that BLM address the

combined impacts of drilling and climate change on all resources: "Regional or

local expressions of climate change (and modeling difficulties for small areas)

should be factored into the NEPA analyses as part of the cumulative impact for

affected resources." ER000345.

Despite these objections, BLM subsequently issued final EAs, along with

findings of no significant impact (FONSIs), and decided to proceed with the

contested leases. ER000030.

MEIC then sued BLM in the U.S. District Court for the District of Montana,

alleging that the agency violated NEPA by, *inter alia*, failing to consider

reasonable alternatives, failing to take a hard look at cumulative impacts and oil

and gas waste, and failing to prepare an environmental impact statement (EIS).

ER000336-41. For relief, MEIC requested the court to declare that BLM violated

NEPA, set aside BLM's action, and void, suspend, or enjoin the leases pending full

compliance with NEPA. ER000341 at ¶¶ A-C.

In its alternatives argument, MEIC alleged that BLM had not considered

reasonable alternatives "to prevent or abate GHG pollution emitted by the

5

production of oil and gas" and "to prevent or abate methane waste and inefficiencies in the production of oil and gas." ER000337-38 at ¶¶ 155-56.

Regarding cumulative impacts, MEIC alleged that BLM failed to adequately evaluate "the combined impact of oil and gas development and climate change on the environment." ER000340-41 at ¶¶ 175, 177. In particular, while BLM's NEPA documents "provide[d] a list of anticipated climate change impacts," the agency failed to "evaluate the aggregate, cumulative impact of oil and gas development and climate change to the environment, the effectiveness of existing mitigation measures, or the resiliency of the environment to withstand further stress." ER000332 at ¶ 121. MEIC noted the multifarious activities required for surface development of oil and gas leases, including "production, processing, transmission, and distribution." ER000317-18 at ¶ 63. MEIC then enumerated the surface impacts of these activities that could be amplified by the impacts of climate change:

> [t]he impacts caused by construction of oil and gas infrastructure, including access roads, well pads, wells, compressor stations, utility lines, pipelines, and other infrastructure, to the environment and the environment's ability to respond to mitigation and to maintain resiliency in the face of climate change;
>
> [t]he impacts caused by the persistent, physical footprint of oil and gas infrastructure to the environment and the environment's ability to respond to mitigation and maintain resiliency in the face of climate change;

> [t]he impacts caused by the operation, maintenance, and use of oil and
> gas infrastructure . . . , as well as the use of that infrastructure over
> time, to the environment and the environment's ability to respond to
> mitigation and to maintain resiliency in the face of climate change;

ER000317 at ¶ 63. MEIC's cumulative impacts argument is particularly important,

as elaborated below, because it was premised not on the GHG emissions that

would result from lease development, but rather on the surface impacts of such

development.

MEIC subsequently moved for summary judgment, carrying forward all of

its arguments. To demonstrate standing, MEIC supplied five declarations, totaling

over 80 pages, including declarations from MEIC's and WildEarth Guardians'

members Wade Sikorski, Steve Gilbert, and George Wuerthner.[3] Wade Sikorski

runs a ranch in the prairie country of Fallon County, Montana, halfway between

Baker and Ekalaka. ER000361 at ¶ 1. His family has ranched this country for

over a century. ER000361 at ¶ 2. Aside from time spent out-of-state for

education, Wade has lived his entire life in Montana. ER000361 at ¶ 2. He

expects to live the rest of his life there, as well. ER000361 at ¶ 2. He travels

throughout Fallon, Custer, and Carter Counties in eastern Montana "on an almost

daily basis and will do so well into the future, sometimes for work, sometimes just

---

[3] To ensure the utmost specificity of the declarations, Declarant Jeremy Nichols of
WildEarth Guardians mapped the exact geographical locations of each of the
challenged leases. ER000403-05 at ¶¶ 18-24; ER000415-24. These maps were
then used by the other declarants.

7

to meditate on the shifting seasons, the wandering wildlife, the shape and contour of the land." ER000362 at ¶ 5. "Seeing vast areas of undisturbed BLM land" in this area, Wade writes, "is one of the greater joys of my life." ER000362 at ¶ 5. Viewing these lands is "an opening into philosophical and spiritual meditation for me. I would like this land to remain the way it is." ER000362 at ¶ 5. Accordingly, he is "deeply troubled" by BLM's oil and gas leases in Fallon, Custer, and Carter Counties. ER000362 at ¶ 5. "I believe that we desperately need a new way of being in the world, one that nurtures and heals the earth," he writes. ER000362 at ¶ 4. The contested leases include four located on his neighbor's property, approximately one mile from his ranch. ER000361 at ¶ 1.

MEIC member Steve Gilbert is a consummate outdoorsman, a hiker, angler, paddler, and skier, who has worked and recreated throughout all 56 counties in Montana, and intends to continue to do so for the rest of his life. ER000352 at ¶¶ 1-2. Steve "seek[s] relatively quiet undeveloped areas for recreation." ER000355 at ¶ 11. "Proposed oil and gas development in Montana," he states, "will cause me to leave many of the places I love to visit." ER000355 at ¶ 11. "[O]il and gas development just isn't consistent with my use of these lands and waters." ER000356 at ¶ 12.

Steve has regularly hunted and plans to continue to hunt sage grouse in Beaverhead County in southwestern Montana, including in the area of one of

8

BLM's proposed oil and gas leases. ER000352 at ¶ 3. Sage grouse habitat in this area is dwindling, and, Steve fears, drilling rigs will further "marginalize and fragment" this habitat. ER000352 at ¶ 3. Steve hunts elk, mule deer, and upland birds in Lewis and Clark County in central Montana near yet another proposed oil and gas lease. ER000353 at ¶ 5. Oil and gas drilling in this area will directly diminish the quality of his hunting experience. ER000353 at ¶ 5. He also regularly paddles and fishes the headwaters of the Missouri River in Broadwater County, adjacent to another proposed lease. ER000353 at ¶ 6. The "peace and quiet" of his fishing experience "where I can hear the swish of my paddle through the water" will be spoiled by the sights and sounds of drilling rigs and associated infrastructure. ER000353 at ¶ 6. In the spring, Steve travels to public lands in the upper Powder River in Powder River County in southeastern Montana, to hunt turkey. ER000353-54 at ¶ 7. He worries that BLM leases in that county will fragment turkey habitat and "create an industrial atmosphere" that will cause him to abandon his annual pilgrimage. ER000354 at ¶ 7. Steve regularly hikes in the eastern Montana badlands in Makoshika State Park in Dawson County. ER000354 at ¶ 8. His enjoyment of this experience "will be drastically reduced" by oil and gas drilling on five BLM leases south of the park. ER000354 at ¶ 8. Steve has also hunted pheasants in Sheridan County in the northeastern corner of the state

and hopes to do so again, but he will not do so if oil and gas drilling occurs on leases in that county.  ER000354-55 at ¶ 9.

George Wuerthner, a naturalist, photographer, writer, educator, and member of WildEarth Guardians, resides in Helena, Montana.  ER000374-76 at ¶¶ 1, 2, 5, 7.  George has studied botany, wildlife biology, range science, and geography.  ER000374 at ¶ 3.  He has worked as a backcountry ranger and a biologist.  Doc.  ER000375 at ¶ 4.  He "has a longstanding love of the outdoors," especially "the open spaces and natural beauty of Montana."  ER000374 at ¶ 2.  For his work and recreation, he travels frequently and extensively throughout Montana.  ER000376-77 at ¶¶ 9-11.  George finds the sight of oil and gas development in Montana displeasing to observe: it "undermines my ability to photograph scenic landscapes and wildlife, and to enjoy the outdoors."  ER000377-78 at ¶ 12.  "Development of oil and gas can usually despoil a view even though it is miles away."  ER000378 at ¶ 13.  All aspects of oil and gas development are displeasing to George:

> The harm that oil and gas development poses to my recreational and professional enjoyment of Montana isn't limited to just drilling rigs or wellsites.  Oil and gas development usually leads to a network of infrastructure, including roads, pipelines, processing facilities, power lines and compressor station[s].  The impacts of oil and gas development thus are not limited to just the lease areas.

ER000388 at ¶ 23.  The sight of methane flaring is one such aspect of oil and gas development.  *See* ER000379 (Image 1).

George is "less likely to return to areas where there is oil and gas development because of the impacts to scenery and my ability to enjoy the scenery." ER000378 at ¶ 13.

> I have also noticed in my travels that where there is oil and gas development, there is less wildlife and that the wildlife that is present may be stressed. I have noticed this, for example, during my travels in southeastern Montana. The roads, pipelines, human activity (trucks driving back and forth), drilling rigs, and other associated activities disturb and fragment vegetation and habitat and thereby negatively impact many wildlife species and, consequently, my experiences in these areas.

ER000382 at ¶ 14. "To put it simply," states George, "I don't enjoy visiting places with oil and gas wells." ER000383 at ¶ 15.

A number of BLM's oil and gas leases are on lands in Broadwater, Gallatin, Lewis and Clark, and Park Counties that George regularly travels through, observes, and visits for recreational and professional purposes, including lands near the Big Belt Mountains and in the Shields River Valley. ER000384-85 at ¶ 17. He plans to return to these areas in the near future. ER000386-87 at ¶ 20. George has also visited and plans to regularly return to the Lima Peaks area in Beaverhead County in southwestern Montana, adjacent to seven of BLM's leases. ER000387 at ¶ 21. This "beautiful landscape" is "one of my favorite parts of Montana," he says. ER000387 at ¶ 21. He is less likely to return, however, if the area is subjected to oil and gas development. ER000387-88 at ¶ 21. George has also visited and plans to return to areas in Richland and Roosevelt Counties in

11

northeastern Montana where BLM has executed additional leases.  ER000388 at

¶ 22.  His enjoyment of this area too will be diminished by lease development.

ER000388 at ¶ 22.

BLM and the Petroleum Institute opposed MEIC's motion for summary

judgment and filed cross motions.  Dist. Ct. Docs. 41, 51.  Both challenged

MEIC's standing, arguing that MEIC could not show that the GHG emissions from

lease development would cause incremental climate change impacts that would

harm MEIC's members' interests.  Doc. 42 at 4-17; Doc. 51 at 7-12.  Importantly,

neither party challenged the adequacy of MEIC's standing declarations for

establishing standing based on the surface impacts of oil and gas development of

the leases.  Dist. Ct. Doc. 60 at 2-11; Dist. Ct. Doc. 63 at 2-6.

On May 24, 2013, the district court heard oral arguments on the parties'

cross-motions.  Dist. Ct. Docs. 65, 67, 69, 73.  On June 14, 2013, the district court

issued a memorandum and order, concluding that MEIC had "not demonstrated

that the sale of the oil and gas leases at issue will lead to climate change impacts

resulting in injury to their recreational and aesthetic interests in lands near the

leases."  ER000021.  Thus the court found MEIC lacked standing, granted BLM's

and the Petroleum Institute's motions for summary judgment, and dismissed the

case.  ER000021.  MEIC timely appealed.  ER000025-26.

## SUMMARY OF ARGUMENT

MEIC has constitutional standing because BLM violated the procedural rules of NEPA, which in turn threatens the concrete interests of MEIC's members. MEIC's members live, work, and recreate on and adjacent to the parcels that BLM has leased for oil and gas development. The surface impacts of oil and gas development on these parcels will harm MEIC's members' interests. This harm will be redressed if, as MEIC has requested, the challenged leases are set aside and BLM is ordered to conduct a lawful NEPA analysis and, thus, reconsider its leasing decisions.

The district court erred in requiring MEIC to show, for standing, that GHG emissions from the challenged leases would cause discrete, incremental climate change impacts to the concrete interests of MEIC's members. Under long-standing Supreme Court precedent, a plaintiff who suffers injury-in-fact from an agency action may seek to invalidate that action by raising any available claim that the agency failed to comply with its statutory mandates. It is thus sufficient for standing for all of MEIC's NEPA arguments—including those premised on the GHG emissions from lease development—that the surface impacts of oil and gas development will cause injury-in-fact to MEIC's members. Alternatively, the district court plainly erred in requiring MEIC to show incremental climate harm to establish standing to raise its NEPA cumulative impacts argument, for that

argument was premised on the surface impacts of the oil and gas leases, not the impacts of their GHG emissions.

## ARGUMENT

### I.     Standard of Review

This Court "review[s] de novo questions of Article III justiciability, including standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).

### II.     Article III Standing

Article III of the United States Constitution broadly states that "[t]he Judicial Power *shall extend to all* Cases . . . arising under . . . the Laws of the United States" and to various "Controversies." U.S. Const. art. III, § 2 (emphasis added). From the "cases" and "controversies" language of Article III, the Supreme Court has fashioned the standing doctrine, which demands, as a jurisdictional prerequisite, that a plaintiff in federal court demonstrate "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Mass. v. EPA*, 549 U.S. 497, 517 (2007).

The Court has long recognized that harm to a plaintiff's aesthetic, recreational, or environmental interests is sufficient to establish standing. *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). Importantly, a plaintiff need not establish actual harm to the environment to support standing; it is enough that a

plaintiff's members "use the affected area" and have "reasonable concerns" that their recreational and aesthetic interests in the area will be lessened. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 183-84 (2000). Further, for traceability, a plaintiff "need not establish causation with the degree of certainty that would be required for him to succeed on the merits, say, of a tort claim." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001); *see Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (stating that a plaintiff need not establish proximate causation to show standing). Finally, it is improper to "raise the standing hurdle higher than the necessary showing for success on the merits." *Laidlaw*, 528 U.S. at 181.

The standing doctrine serves several purposes. It acts to assure that the plaintiffs have "alleged such a personal stake in the outcome of [a] controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20 (1998) (noting that standing "helps assure that courts will not pass upon abstract intellectual problems, but adjudicate concrete living contests between adversaries" (internal quotes, ellipsis, and alterations omitted) (quoting *Coleman v. Miller*, 307 U.S. 433, 460 (1939) (Frankfurter, J., dissenting)).

The doctrine also serves a separation-of-powers role, acting to "prevent the judicial process from being used to usurp the powers of the political branches."

15

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). Thus, the standing

doctrine has been applied most stringently in cases involving matters committed

chiefly to other branches of government, such as "the fields of intelligence

gathering and foreign affairs," *id.*, and federal- and state-taxpayer suits challenging

spending programs, *e.g.*, *DiamlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344-45

(2006) (noting that a government revenue decision is "the very epitome of a policy

judgment committed to the 'broad and legitimate discretion' of lawmakers"); *see*

*also Frothingham v. Mellon*, *decided with Mass. v. Mellon*, 262 U.S. 447 (1923).

On the other hand, consistent with constitutional checks and balances,

"Congress has the power to define injuries and articulate chains of causation that

will give rise to a case or controversy where none existed before." *Mass.*, 549 U.S.

at 516 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 580 (1992)

(Kennedy, J., concurring)). Accordingly,

> a litigant to whom Congress 'has accorded a procedural right to
> protect his concrete interests' . . . 'can assert that right without
> meeting all the normal standards for redressability and immediacy.'
> When a litigant is vested with a procedural right, that litigant has
> standing if there is some possibility that the requested relief will
> prompt the injury-causing party to reconsider the decision that
> allegedly harmed the litigant.

*Id.* at 518 (internal citations omitted) (quoting *Lujan*, 504 U.S. at 572 n.7).

In NEPA cases, as here, where a plaintiff alleges a violation of its procedural

rights that protect its concrete interests, the requirements of standing are relaxed.

16

*See Lujan*, 504 U.S. at 572 n.7 (stating that "one living adjacent to the site" of a proposed dam "has standing to challenge the licensing agency's failure to prepare an environmental impact statement").  Thus, a plaintiff raising a NEPA claim satisfies the injury-in-fact requirement of standing by (1) alleging that the federal agency has violated NEPA,[4] (2) demonstrating that NEPA protects the plaintiff's concrete interests, and (3) demonstrating that it is "reasonably probable that the challenged action will threaten [the plaintiff's] concrete interests."  *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011).  The plaintiff may then satisfy the relaxed causation and redressability requirements by showing that "a revised NEPA analysis may redress" the plaintiff's injuries.  *Id.* at 1172.

Application of this relaxed standard in NEPA cases is consonant with the congressional directives embodied in that statute:

> Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs.  It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an EIS [environmental impact statement].

*City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975).  It would be contrary to the congressional intent behind NEPA to require as part of standing that "the

---

[4]  For the standing analysis, only allegations of procedural violations are necessary, as a contrary rule would improperly require an analysis of the merits prior to a determination of standing.  *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 n.5 (9th Cir. 2003).

plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *Id.*; *see also Sierra Club v. Adams*, 578 F.2d 389, 392-93 (D.C. Cir. 1978) (observing that stringent standing requirements in NEPA suits "would be patently inconsistent with the unequivocal legislative intent embodied in NEPA"). Indeed, the Supreme Court's broadest reading of the standing doctrine has been in the context of a NEPA claim. *See United States v. Students Challenging Regulatory Agency Procedures* (*SCRAP*), 412 U.S. 669, 684-690 (1973), *cited with approval in Mass.*, 549 U.S. at 526 n.24; *see also* William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 259-62 (1988) (arguing that the result in *SCRAP* is justified given the broad congressional purpose of NEPA to mandate environmental investigation).

## III. The Declarations of MEIC's Members Wade Sikorski, Steve Gilbert, and George Wuerthner Meet the Requirements of Article III Standing Based Solely on the Surface Impacts of Oil and Gas Development.

Here, MEIC meets the requirements of Article III standing. MEIC has demonstrated injury-in-fact. First, MEIC's complaint alleges that BLM violated the procedural provisions of NEPA in approving the challenged oil and gas leases. ER000336-41. Specifically, MEIC alleged, *inter alia*, that BLM failed to consider reasonable alternatives, failed to take a hard look at oil and gas waste and the cumulative impacts of oil and gas development and climate change, and failed to prepare an EIS. ER000336-41.

18

Second, MEIC demonstrated that NEPA protects its members' concrete interests.  The so-called concrete interests test requires "a geographical nexus between the individual asserting the claim and the location suffering an environmental impact."  *Ctr. for Food Safety*, 636 F.3d at 1172 (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).  The affidavits submitted by MEIC's members Wade Sikorski, Steve Gilbert, and George Wuerthner establish this geographical nexus by showing that they live, work, and recreate in and adjacent to the specific parcels leased for oil and gas development by BLM.[5]

Third, MEIC demonstrated that it is "reasonably probable" that BLM's leasing decisions threaten their members' concrete interests.  Again, the affidavits of MEIC's members far surpass the standard of showing a "reasonable probability"

---

[5]  Gilbert Decl., ER000351-55 at ¶ 3 (hunting sage grouse near leases in Beaverhead County), ¶ 5 (hunting elk, mule deer, and upland birds in Lewis and Clark County near leases), ¶ 6 (fishing and paddling Missouri River adjacent to leases in Broadwater County), ¶ 7 (fishing and turkey hunting near oil and gas leases in Powder River County), ¶ 8 (hiking in badlands near leases in Dawson County), ¶ 9 (pheasant hunting and traveling along state highway adjacent to leases in Sheridan County); Sikorski Decl., ER000361 at ¶ 1 (leases on neighbor's property in Fallon County and other leases in Custer and Carter Counties are near ranch), ¶ 2 (rancher and doctor); Weurthner Decl., ER000373-88 at ¶ 4 (biologist and teacher), ¶ 5 (photographer and writer), ¶ 7 (education activities), ¶ 17 (regularly visiting, traveling by and through, observing, and photographing specific lease areas in Broadwater, Gallatin, Lewis and Clark, and Park Counties), ¶ 20 (intention to return to areas), ¶ 21 (regularly hiking and photographing leased areas in Beaverhead County), ¶ 22 (visiting, photographing, and traveling by and through leases in Richland and Roosevelt Counties).

that the surface impacts from the oil and gas development enabled by BLM's leases will threaten their concrete economic, recreational, and spiritual interests.[6] Thus, MEIC has established injury-in-fact.

MEIC also meets the relaxed requirements of causation and redressability. To meet these standards, "it is enough that a revised NEPA analysis *may redress*" a plaintiff's injuries. *Ctr. for Food Safety*, 636 F.3d at 1172 (emphasis added) (internal modifications omitted) (quoting *W. Watersheds Project*, 632 F.3d at 485); *Massachusetts*, 549 U.S. at 518 (stating that a plaintiff asserting violation of a procedural right that protects concrete interests has standing if "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant"). Here, MEIC's

---

[6] Gilbert Decl., ER000352-55 at ¶ 3 (concerned that drilling infrastructure will fragment and marginalize sage grouse habitat, impacting hunting interests), ¶ 5 (oil and gas drilling and lease development will impact enjoyment of elk, deer, and upland bird hunting), ¶ 6 (sight and sound of drilling rigs and oil and gas infrastructure will diminish quiet enjoyment of paddling and fishing), ¶ 7 (habitat fragmentation from oil and gas drilling, as well as sights and sounds of oil and gas operations, will impact hunting and fishing experience), ¶ 8 (surface development of leases will impact enjoyment of hiking experience), ¶ 9 (less likely to use small highway if truck traffic from drilling operations causes congestion), ¶ 10 (stating that "oil and gas development just isn't consistent with my use of these lands and waters"); Sikorski Decl., ER000362 at ¶ 5 (observing undeveloped BLM land "is one of the greater joys of my life," which creates "an opening into philosophical and spiritual meditation," and therefore troubled by the prospect of development of adjacent leases); Weurthner Decl., ER000377-389 at ¶ 12 (finding sight of oil and gas development displeasing), ¶¶ 18-19 (ability to enjoy and photograph areas diminished by oil and gas development), ¶¶ 21-23 (surface impacts of lease development impair recreational and professional interests in leased areas).

requested relief is to set aside the challenged leases and have BLM reconsider its leasing decision by conducting a lawful NEPA analysis and preparing an EIS. ER000341 at ¶¶ B-C.  Further, if BLM conducts a lawful NEPA analysis it may decide, quite simply, not to issue the leases, which would redress the injuries to MEIC's members from the surface impacts of oil and gas development.[7]

For these reasons MEIC has Article III standing.

## IV.     The District Court's Holding That MEIC Lacked Standing Was in Error Because MEIC Has Standing Based on the Surface Impacts of Oil and Gas Development.

The district court erroneously held that MEIC lacked standing to challenge BLM's leasing decisions.  MEIC had not, the court reasoned, "demonstrated that the sale of the oil and gas leases at issue will lead to climate change impacts resulting in injury to their recreational and aesthetic interests in lands near the leases."  ER000021.  The court declined to consider whether MEIC could establish standing based on the harm from the surface impacts of lease development to the concrete interests of MEIC's member.  Instead, the court simply noted: "[A]ll of Plaintiffs' claims are based upon climate change impacts.  Plaintiffs do not assert claims based solely upon surface disturbance or on-the-ground activities associated

---

[7]  Because MEIC's members have standing, MEIC has standing.  *Summers v. Earth Island Inst*., 555 U.S. 488, 494 (2009) ("It is common ground that [environmental] organizations can assert the standing of their members.").  MEIC's claims are also within the zone of interests of NEPA, a requirement of prudential standing that was not challenged below.  *See Ctr. for Food Safety*, 636 F.3d at 1172 n.7.

with oil and gas development that are wholly independent of alleged climate change impacts."  ER000010-11 at n.19.

    As detailed below, the district court's decision is flawed for two primary reasons.  First, MEIC need not demonstrate that GHG emissions from the challenged oil and gas leases will cause particular climate change impacts that harm MEIC's protected interests in order to demonstrate standing.  Instead, to establish standing to pursue its NEPA arguments, MEIC need only demonstrate that it has concrete interests—irrespective of the GHG emissions—that may be injured by development of the oil and gas leases and that such injuries would be redressed if MEIC prevails on its NEPA arguments.  Second, even if that were not the case, MEIC's cumulative impacts argument—i.e., that BLM failed to account for the impacts of oil and gas development cumulatively with the impacts of climate change—is neither premised nor contingent upon the projected GHG emissions from development of the challenged oil and gas leases.  Under Ninth Circuit precedent, MEIC plainly has standing to bring this claim.

A. **Because MEIC's Members Will Be Injured by the Surface Impacts of BLM's Oil and Gas Leases, MEIC May Challenge the Leases Based on Any Grounds on Which BLM Failed to Comply with NEPA, Including Grounds Related to the Leases' GHG Emissions.**

1. **MEIC's Injuries Caused by Surface Impacts of Lease Development Establish Standing for MEIC to Pursue All of Its NEPA Arguments.**

MEIC's standing based on the surface impacts of oil and gas lease development is a sufficient basis for all of MEIC's NEPA arguments, including those relating chiefly to GHG emissions from lease development. The district court's holding to the contrary, which impermissibly blended standing and the merits of MEIC's claims, was in error.

The Supreme Court has consistently held that a plaintiff who is harmed by a given agency action may challenge that action on *any basis* on which the agency may have violated its statutory mandates, even bases that do not impact the plaintiff's specific interests. Put differently, once a plaintiff establishes standing to challenge an agency action, the plaintiff may then raise any available merits argument that the action was unlawful, without having to establish constitutional standing for each individual argument.

In its seminal decision on standing in environmental cases, *Sierra Club v. Morton*, the Court announced that once a plaintiff establishes the requisite injury-in-fact, "that person may argue the public interest in support of his claim that the

23

agency has failed to comply with its statutory mandate." 405 U.S. 727, 737

(1972). The Court repeated this rule in *Warth v. Seldin*, stating that

> so long as this requirement [injury-in-fact] is satisfied, persons whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.

422 U.S. 490, 501 (1975).

The Court recently reaffirmed this reasoning in *DiamlerChrysler Corp. v. Cuno*, stating that "once a litigant has standing to request invalidation of a particular agency action, *it may do so by identifying all grounds on which the agency may have failed to comply with its statutory mandate*." 547 U.S. 332, 353 n.5 (2006) (emphasis added) (internal quotation omitted) (quoting *Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) (quoting *Morton*, 405 U.S. at 737)). This is all to say that standing is a factual inquiry, separate and apart from the merits of a plaintiff's claim, and (except in the context of a taxpayer suit) the injury that serves as the basis of standing need not be directly connected to the plaintiff's cause of action. *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 72-81 (1978) (specifically rejecting the need for a direct connection between the injuries plaintiffs allege and the legal argument asserted), *followed in*, *Bd. of Natural Res. of St. of Wash. v. Brown*, 992 F.2d 937, 945 (9th Cir. 1993); *accord Sierra Club v. Adams*, 578 F.2d at 391-93 (holding that plaintiff organization

which had standing to challenge NEPA analysis of project could raise arguments about issues that did not affect plaintiffs but were in the broader public interest); *see also Lujan*, 504 U.S. at 572 n.7 (noting that a plaintiff living next to a proposed dam would have standing to bring a NEPA challenge and never suggesting that a separate showing of standing would be required for each individual NEPA argument).

In the specific context of climate-change-related arguments, the D.C. Circuit and various district courts have applied this very reasoning, holding that plaintiffs whose interests would be harmed by the local impacts of GHG-emitting activities had standing to raise climate change claims. In *Center for Biological Diversity v. Department of the Interior*, plaintiff organizations (collectively "the Center") challenged agency approval of off-shore oil and gas leases in Alaska under NEPA and the Endangered Species Act (ESA), raising various climate change claims. 563 F.3d 466, 471-72 (D.C. Cir. 2009). The court held that the Center had standing to raise its climate change arguments based on its members' concrete interests in viewing wildlife that would be impacted by the surface activities associated with offshore oil and gas drilling, even though that injury that established standing was distinct from the harm that was the basis of the Center's climate change arguments. 563 F.3d at 479. Thus, as in *Duke Power* and *Sierra Club v. Adams*, the court in *Center for Biological Diversity* found standing based

25

on a concrete injury that was different from the harm that was the basis of the plaintiff's NEPA argument.

The court in *Center for Biological Diversity* employed essentially the same legal analysis that was advanced nearly two decades earlier by then-Judge Ruth Bader Ginsburg in her instructive concurrence in a seminal climate change case, *City of Los Angeles v. National Highway Traffic Safety Administration*, 912 F.2d 478 (D.C. Cir. 1990), *overruled by Florida Audubon Society v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc).[8]  In *City of Los Angeles*, as in *Center for Biological Diversity* and the instant case, a plaintiff organization (Natural Resources Defense Council or "NRDC") raised a NEPA challenge to an agency action (a rollback in mandated automobile fuel economy standards) on the basis of the GHG emissions that would result from the action.  *Id.* at 481-82 (per curiam).  A divided panel held that NRDC had standing.  *Id.* at 482.  Chief Judge Wald, writing for the majority, found standing based on the risk of harm from climate change and the geographical nexus between NRDC's members and locations affected by climate change impacts.  *Id.* at 492-95 (Wald, C.J., for majority).

---

[8]  Though the majority opinion by Judge Wald on standing in *City of Los Angeles* was overruled in the D.C. Circuit in *Florida Audubon*, the Ninth Circuit has rejected the more stringent standing analysis adopted in *Florida Audubon*.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 974 (9th Cir. 2003).  Further underscoring its rejection of *Florida Audubon*, the Ninth Circuit recently adopted the reasoning on the merits of Chief Judge Wald's opinion in *City of Los Angeles*.  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217, 1224-25 (9th Cir. 2008).

Judge D.H. Ginsburg dissented on standing, reasoning—as did the district court in the instant case—that NRDC could not identify specific climate change harms caused by the incremental increase in GHG emissions that would result from the agency action. *Id.* at 483-84 (D. Ginsburg, J., dissenting). Judge Ruth Bader Ginsburg concurred with Chief Judge Wald on standing, but offered a different and incisive analysis:

> [I] agree with Chief Judge Wald that NRDC has standing under NEPA. A testing question, in my judgment, is whether NRDC would have standing to complain in court had NHTSA failed to engage in *any* environmental review, despite the directions contained in Council on Environmental Quality (CEQ) NEPA implementing regulations. If, as I believe, the answer to that question is "yes," then the adequacy of the agency's compliance, i.e., NHTSA's preparation of an "environmental assessment " rather than a fuller impact statement, relates to the merits, it seems to me, not to threshold standing.

*Id.* at 504 (R. Ginsburg, J., concurring). Thus, Judge R.B. Ginsburg would clearly separate the standing and merits inquiries, and, under her analysis, if a plaintiff would be harmed by an agency action, then the plaintiff would have standing to challenge the action on any basis on which the agency failed to comply with its duties under NEPA, including a failure to adequately address climate change issues. Not only did Judge R.B. Ginsburg's analysis of standing in *City of Los Angeles* presage the analysis eventually adopted by the D.C. Circuit in *Center for*

27

*Biological Diversity*, it is also fully in line with the Supreme Court's statements in *Sierra Club v. Morton*,[9] *DiamlerChrysler*,[10] *Duke Power*,[11] and *Lujan*.[12]

Federal district courts in Colorado and California have also held that surface impacts to a plaintiff's concrete interests support standing to allow the plaintiff to raise a NEPA argument related to the GHG emissions and resultant climate harm caused by the challenged action. *WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1235 (D. Colo. 2011) (holding that surface impacts sufficient to support standing to raise climate change arguments under NEPA and rejecting argument that plaintiffs had to make additional showing to raise such climate change arguments); *Border Power Plant Working Group v. Dep't of Energy*, 260 F. Supp. 2d 997, 1010-11, 1028-29 (S.D. Cal. 2003) (concluding that plaintiffs had standing based on "proximity to the project" to bring NEPA challenge that the agency analysis failed to adequately evaluate GHG emissions associated with transmission line (from connected power plants)); *see also Nw. Envtl. Def. Ctr. v.*

---

[9]  405 U.S. at 737 (stating that a plaintiff with standing may raise arguments in the public interest).

[10]  547 U.S. at 353 n.5 (noting that a plaintiff with standing to challenge an agency action may raise any available argument that the agency failed to comply with its statutory mandate).

[11]  438 U.S. at 72-81 (holding that outside of taxpayer suits, there need be no direct connection between the injury that confers standing and the injury that is the basis of a plaintiff's legal claim).

[12]  504 U.S. at 572 n.7 (noting that under NEPA a plaintiff who will be injured by an agency action—such as the construction of a dam—has standing to bring a NEPA challenge, without regard to the merits of any particular NEPA argument).

*Owens Corning Corp.*, 434 F. Supp. 2d 957, 960-62, 965 (D. Or. 2006) (Clean Air

Act (CAA) case where plaintiffs claimed manufacturing plant required permit for

hydrochlorofluorocarbon (HCFC) emissions that contributed to global ozone-

depletion and climate change; court found standing in part based on fact that

plaintiffs lived near the proposed plant and would suffer from local pollution

impacts).

The Ninth Circuit has also adopted analogous reasoning—that surface

impacts to a plaintiff's concrete interests suffice for standing to raise broader

environmental arguments—in the related context of local air pollution contributing

to global ozone depletion.  In *Covington v. Jefferson County*, the Covingtons lived

across from a local dump and sued the local regulatory authority (the county) for

violating CAA rules regulating the release of ozone-depleting gases

(chlorofluorocarbons (CFCs)) from discarded appliances (white goods).  358 F.3d

626, 633-34 (9th Cir. 2004).  The district court held that the Covingtons lacked

standing to bring their CAA claim.  *Id.* at 634.  On appeal, the Ninth Circuit

reversed.  *Id.* 641.  Without addressing whether the CFCs at issue would contribute

to global ozone depletion and, in turn, cause incremental harm to the Covingtons,

the court reasoned:

> The evidence of leakage of white goods provided by the Covingtons is
> sufficient to show injury in fact because failure to comply with the
> CAA has increased the risk of harm to the Covingtons' property.  The
> Covingtons have observed liquids leaking from the white goods and

> they fear that this liquid will contaminate their property. From this,
> the Covingtons enjoyment of their property is diminished by the
> attested leaks. . . . That is enough for injury in fact for the CAA
> claims.

*Id.* at 641. Thus, once again, the discrete surface impacts of a challenged activity served to establish standing for a legal argument premised on the activity's much broader air-pollution impacts.

Here, consistent with these authorities, because its members' interests will be directly harmed by the surface impacts of BLM's oil and gas leases, MEIC has standing to seek invalidation of BLM's leasing decision by identifying *any* basis by which BLM violated NEPA, including arguments related to GHG emissions from the leases (such as MEIC's alternatives argument). Because the standing inquiry is separate from the merits of MEIC's arguments, it is helpful to consider the question that then-Judge Ruth Bader Ginsburg asked in *City of Los Angeles*: would MEIC have standing to challenge BLM's oil and gas lease decision if BLM had conducted *no* NEPA analysis? Because MEIC's members' concrete interests in the leased parcels will be harmed by oil and gas development, the answer must be yes. As Judge Ginsburg observed in *City of Los Angeles*, this answer and MEIC's consequent standing should not change if, as happened here, BLM conducted *a legally inadequate* NEPA analysis, rather than failing to conduct a NEPA analysis at all. MEIC's various arguments about the particular failings of BLM's NEPA analysis are questions of the merits, not of standing. *City of Los*

30

*Angeles*, 912 F.2d at 504 (R. Ginsburg, J, concurring); *see also, e.g.*, *Covington*, 358 F.3d at 639 (noting impropriety of blending standing with merits).[13]

> **2.    Holding That MEIC Has Standing to Pursue All of Its NEPA Arguments Is Consistent with the Purposes Behind the Standing Doctrine.**

Reaching this conclusion and finding standing in this case are wholly consistent with the purposes behind the standing doctrine. First, the "concrete adverseness" noted in *Baker v. Carr*, 369 U.S. at 204, is present here. This case involves specific disputes about the oil and gas extraction process and the resultant environmental impacts to particular parcels of land that hold unique value to MEIC's members. Such cases are not new to federal courts. *See, e.g.*, *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (NEPA challenge to oil and gas leases in Montana). This Court is certainly not being asked to pass on an abstract intellectual problem. *Akins*, 524 U.S. at 20.

---

[13]  The recent decision in *Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013) does not affect this analysis. In that case the plaintiffs sought to establish standing on the basis of "injuries resulting from elevated levels of greenhouse gases." *Id.* at 1139. The court held that they were unable to demonstrate that such GHG emissions caused specific injuries to the plaintiffs. *Id.* at 1143. Unlike, *Bellon*, here MEIC does not seek to establish standing based on impacts of the GHG emissions from the challenged oil and gas leases (though MEIC did raise this as a secondary argument at the district court, MEIC no longer asserts standing on those grounds). Instead, MEIC demonstrates the requirements of standing based on the injuries to its members' interests from the *surface impacts* of lease development. *See supra* Part III. Thus, *Bellon* is wholly inapposite to the present case. Further, pursuant to the sua sponte request of a judge on the Ninth Circuit, *Bellon* is currently under consideration for rehearing en banc. *Wash. Envtl. Council v. Bellon*, No. 12-35323, Dkt. 67 at 2-3 (Oct. 31, 2013).

Second, in seeking judicial resolution of this matter, MEIC is not asking the judiciary to improperly usurp the authority of other branches of government.  *See Clapper*, 133 S. Ct. at 1146.  Here, the district court was not being asked to second guess congressional revenue decisions or to oversee presidential management of foreign affairs.  *Cf. id.* at 1146-47; *DiamlerChrysler*, 547 U.S. at 344-45.  Rather, it was being asked to conduct the quintessential judicial task of reviewing specific agency action (BLM leasing decisions) under NEPA and the Administrative Procedure Act.  Judicial decisions in this area are legion and fully consistent with our tri-partite governmental structure.  The run-of-the-mill nature of this case is not altered by the presence of arguments related to climate change or GHG emissions.  The Ninth Circuit has already ruled on the merits of climate change claims under NEPA, without notable government disruption.  *Compare Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213-27 (9th Cir. 2008) (upholding climate-change-related NEPA challenge to agency action), *with Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1139-40 (9th Cir. 2011) (rejecting climate-change-related NEPA arguments on merits).

On the other hand, to impose, as the district court did, a more aggressive standing inquiry that scrutinizes the nuances of each NEPA argument (or sub-argument) that a plaintiff may present would take the standing doctrine far beyond the aforementioned purposes for which it was developed.  This would allow the

standing inquiry to subsume the merits of NEPA arguments, contrary to the warning of the Supreme Court in *Laidlaw*, 528 U.S. at 181 (standing inquiry should not be more onerous than merits inquiry). In fact, it would usurp congressional authority, by thwarting the congressional purpose behind NEPA and forcing plaintiffs, as a prerequisite of standing, to conduct the very environmental review that they assert should be prepared. *See Davis*, 521 F.2d at 670-71; Fletcher, *supra*, 98 Yale L.J. at 259-60. Article III does not impose such impediments.

Here, MEIC simply seeks and pursuant to Article III is entitled to a ruling on the merits of its NEPA arguments.

### B. Alternatively, MEIC Has Standing to Assert Its Cumulative Impacts Argument, Which Is Premised on the Surface Impacts of Oil and Gas Development—Not GHG Emissions from Such Development.

Even if this Court holds that MEIC was required to demonstrate discrete, localized injuries traceable to the projected GHG emissions from development of the challenged oil and gas leases to establish standing for each of its NEPA arguments that address such emissions, MEIC was still not required to make such a demonstration in order to establish standing to assert its cumulative impacts argument. This is because MEIC's cumulative impacts argument was premised on the environmental disruption caused by the *surface impacts* of oil and gas development in the broader context of global climate change, rather than on the

particular *GHG emissions* from lease development.  MEIC specifically asserted in its complaint and argued in its motion for summary judgment that BLM had failed to consider the impacts of surface development of oil and gas leases cumulatively with the impacts of climate change on the environment.[14]

The Ninth Circuit has specifically held such analysis of cumulative impacts is both cognizable and mandated under NEPA.  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).  More importantly, the Ninth Circuit has directly held that the surface impacts of a proposed action are sufficient to confer standing for a plaintiff to challenge a permitting agency's NEPA analysis of the cumulative environmental impacts from the challenged activity together with the impacts of climate change.  *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009).

In *Kempthorne*, plaintiffs (Center for Biological Diversity or "the Center") challenged the U.S. Fish & Wildlife Service's promulgation of regulations allowing the non-lethal take of polar bears and walrus by oil and gas operations along the Beaufort Sea on the coast of Alaska.  *Id.* at 705-07.  Among other claims,

---

[14]  ER000317-18 at ¶ 63 (noting surface impacts); ER000340-41 at ¶¶ 175, 177 (arguing BLM failed to take hard look at "combined impact of oil and gas development and climate change on the environment"); Dist. Ct. Doc. 35 at 23 ("In this case BLM admits that the development of oil and gas leases impacts the environment.  BLM also admits that climate change impacts the environment.  BLM, however, failed to take the next logical step: a hard look at the cumulative impacts of oil and gas development *and* climate change to the environment." (internal citations omitted)).

the Center alleged that the agency violated NEPA by failing to consider the

combined impacts to polar bears from oil and gas operations and climate change.

*Id.* 711 (noting arguments that agency "failed to address 'the impacts to polar bears

from disturbance by oil and gas activities in the context of global warming'" and

that agency failed to "synthesize" the impacts to bears from climate change and

"multiplying effects of oil and gas activities").  The agency challenged standing.

*Id.* at 707.  The court rejected the agency's argument and held that the Center had

standing based on the impacts to its members' interests from oil and gas drilling

along the Alaskan coast.  *Id.* at 707-08.  The court reasoned:

> [P]laintiff members allege that they have viewed polar bears and
> walrus in the Beaufort Sea region, enjoy doing so, and have plans to
> return.  If the plaintiffs' allegations are true, the Service's incidental
> take regulations threaten imminent, concrete harm to these interests by
> destroying polar bears and walrus in the Beaufort Sea. . . .  [T]his
> injury is geographically specific, is caused by the regulations at issue,
> and is imminent.

*Id.* at 707-08.

Here, MEIC's cumulative impacts claim is virtually identical to that raised

by the Center in *Kempthorne*.  Thus, for the same reason that the Center had

standing in *Kempthorne*—the geographical nexus between its members' interests

and surface drilling operations—MEIC has standing here.  MEIC's members Wade

Sikorski, Steve Gilbert, and George Wuerthner have deep personal bonds with the

country that BLM has leased for oil and gas development, bonds that for them will

be forever severed if this country is transformed into 50,000 acres of industrial landscape—a transformation that could significantly reduce the resiliency and increase the vulnerability of these lands to the worsening impacts of climate change. Thus, at the very least, the district court's ruling dismissing MEIC's cumulative impacts claim on the basis of standing was in error.

## CONCLUSION

For the foregoing reasons, MEIC has standing to raise all of its NEPA claims in this matter. The district court erred in ruling to the contrary. MEIC respectfully requests that this Court reverse the district court's order dismissing MEIC's claims and remand for a ruling on the merits.

Respectfully submitted this 12th day of December 2013,

/s/ Shiloh Hernandez
Shiloh Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
406.204.4861
hernandez@gmail.com

Erik Schlenker-Goodrich
Western Environmental Law Center
208 Paseo del Pueblo Sur, Unit 602
Taos, New Mexico 87571
575.613.4197
eriksg@westernlaw.org

Sarah McMillan

WildEarth Guardians
P.O. Box 7516
Missoula, Montana 59807
406.549.3895
smcmillan@wildearthguardians.org

## REQUEST FOR ORAL ARGUMENT

MEIC hereby requests oral argument.  Oral argument would afford all parties the opportunity to clearly and simply engage this Court in a dialogue concerning the important legal question raised by this case and to respond to any questions that this Court may have regarding the case.

## STATEMENT OF RELATED CASES

In accordance with Ninth Circuit Rule 28-2.6, I hereby certify that the MEIC is unaware of any related cases in this Court.


/s/ Shiloh Hernandez
Shiloh Hernandez

## CERTIFICATE OF COMPLIANCE

I hereby certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is proportionately spaced, has a typeface of 14 points or more and contains 8,996 words.


/s/ Shiloh Hernandez
Shiloh Hernandez

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2013, I electronically filed the foregoing APPELLANTS' OPENING BRIEF and EXCERPTS OF RECORD with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated December 12, 2013.


/s/ Shiloh Hernandez
Shiloh Hernandez